# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN W. HOLMES JR. AND JULIE ANN HOLMES, Husband and Wife, )<br>)<br>) | Case No. CV 07-421-EJL-LMB |
| ) | |
| Plaintiffs, )<br>) | **REPORT AND**<br>**RECOMMENDATION** |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, BUREAU OF LAND MANAGEMENT, )<br>) | |
| ) | |
| Defendants. ) | |
| _____) | |

Currently pending before the Court are Plaintiffs' Motion for Summary Judgment (Docket No. 11) and Defendant's Cross-Motion for Summary Judgment (Docket No. 14).  This case was referred to the undersigned by United States District Judge Edward Lodge for all pre-trial matters (Docket No. 20) and the Court held a hearing on September 8, 2008 (Docket Nos. 12, 17).  Having carefully reviewed the record (including supplemental briefing), considered oral arguments, and otherwise being fully advised, the Court enters the following Report and Recommendation.

# I.

# BACKGROUND

This is a quiet title action brought pursuant to the Quiet Title Act, 28 U.S.C. § 2409a. Plaintiffs, John W. Holmes Jr. and Julie Ann Holmes (the "Holmes"), claim ownership rights, including all coal and other mineral rights, to certain real property located in Washington

County, Idaho.  *See Complaint to Quiet Title,* ¶ 14 (Docket No. 1).  The sole named Defendant, the United States of America, through the Bureau of Land Management ("BLM"), claims title to the coal and mineral rights on the property.  *Answer of United States*, ¶ 15 (Docket No. 2).

## II.

## FACTS

The facts in this case are largely undisputed and focus almost exclusively upon the chain of title.  Plaintiffs are owners of certain real property legally described as Lot 4, SW 1/4 of NW 1/4, and N 1/2 of SW 1/4 of Section 1 in T10N R4W, Washington County, Idaho (the "Holmes Property").  *Verified Complaint to Quiet Title*, ¶ 5 (Docket No. 1).

On July 15, 1959, the United States conveyed the coal and mineral rights to a portion of the Holmes Property, legally described as the NE 1/4 of the SW 1/4 of Section 1, T10N, R4W, to Claire K. Kirk.  *Id.* at ¶ 6, Ex. 1 (Docket Nos. 1, 1-2).  Ownership of the coal and mineral rights to this portion of the Holmes Property is not in dispute.  *Id.* at ¶ 6 (Docket No. 1).  Ownership of the coal and mineral rights to the remaining portion of the Holmes Property (the "Ballard Property") is the subject of the instant litigation.

The Ballard Property was originally conveyed from the United States Land Office to John E. Ballard by Patent Number 1095560 (the "Ballard Patent") on February 14, 1938.  *Id.* at Ex. 2 (Docket No. 1-3).  The Ballard Patent expressly excludes all coal and other mineral rights, which were reserved for the United States and managed by the Department of Interior.  *Verified Complaint to Quiet Title*, Ex. 2 (Docket No. 1-3).

On February 14, 1985, subsequent Property owners, David V. Frei and Annabel M. Frei (the "Freis"), transferred the Holmes Property to the Farmers Home Administration ("FmHA"),

**REPORT AND RECOMMENDATION - 2**

through a Deed in Satisfaction of Mortgage Indebtedness.  *Id.* at  Ex. 3 (Docket No. 1-4).  The

Deed in Satisfaction of Mortgage Indebtedness states that the Ballard Property is "conveyed unto

the UNITED STATES OF AMERICA, acting through the Farmers Home Administration,

United States Department of Agriculture."  *Id.*

     Almost seven years later, on January 6, 1992, the Fries entered into a contract to purchase

the Ballard Property back from the FmHA.  *Id.* at Ex. 4 (Docket No. 1-5).  The contract states, in

part, "[t]he Government will convey to the purchaser all mineral rights to which it has title."  *Id.*

     On February 3, 1992, the FmHA conveyed the Ballard Property back to the Fries by

quitclaim deed.  *Id.* at Ex. 5 (Docket No. 1-6).  The quitclaim deed states that "[t]he UNITED

STATES OF AMERICA, acting through the Administrator of the Farmers Home

Administration, United States Department of Agriculture, CONVEYS and QUITCLAIMS to . . .

'all interest' in [the Ballard Property]."  *Id.*

     On February 12, 1992, the Freis conveyed the Ballard Property by warranty deed to Richard

A. Hill and Betti C. Hill ("the Hills").  *Id.* at Ex. 6 (Docket No. 1-7).  The Hills then conveyed

the Ballard Property by warranty deed to Leonard L. Stewart and Barbara Stewart, who

conveyed the Ballard Property by warranty deed to Rocky Mountain Sports & Gaming LLC.  *Id.*

at Exs. 7-8  (Docket No. 1-8, 1-9).  On April 1, 1999, Rocky Mountain Sports & Gaming LLC

conveyed the Ballard Property by quitclaim deed to Rocky MT. Land LLC and Plaintiffs

purchased the Ballard Property from Rocky MT. Land LLC by warranty deed on December 28,

2001.  *Id.* at Exs. 9 - 10 (Docket Nos. 1-10, 1-11).

**REPORT AND RECOMMENDATION - 3**

## III.

## JURISDICTION

Plaintiffs bring this action under the Quiet Title Act, 28 U.S.C. § 2409a.  The Court has

subject matter jurisdiction pursuant to 28 U.S.C. § 1346(f).

## IV.

## SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which

provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

## V.

## DISCUSSION

The central issue in this case is whether the FmHA, acting on behalf of the United States,

conveyed to the Freis the mineral rights originally reserved by and for the United States, acting

through the Department of Interior.  The United States also raises issues concerning the validity

of certain exchanges in the chain of title following the Freis' acquisition of the property in 1992.

**A.      Controlling Law**

Pursuant to the Rules of Decisions Act, 28 U.S.C. § 1652, Idaho law applies to determine the

property interests of the parties.  The Rules of Decisions Act provides that "[t]he laws of the

several states, except where the Constitution or treaties of the United States or acts of Congress

otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts

**REPORT AND RECOMMENDATION - 4**

of the United States, in cases where they apply." *Id.*  Moreover, property issues are generally

determined by state law, *see Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 155 (1944), and the

Ninth Circuit has specifically recognized the application of state law to claims brought under the

Quiet Title Act, *see Kimberly Assocs. v. U.S.*, 261 F.3d 864, 868 (2001).

At the same time, "land grants are construed favorably to the Government." *United States v.

Union Pac. R.R.*, 353 U.S. 112, 116 (1957); *see also Caldwell v. United States*, 250 U.S. 14, 20

(1919); *Southern Idaho Conf. Ass'n of Seventh Day Adventists v. United States*, 418 F.2d 411,

415, n.8 (9th Cir. 1969).  Accordingly, "nothing passes except what is conveyed in clear

language, and . . .  if there are doubts they are resolved for the Government, not against it." *Id.*

**B.      Mineral Reservations under the Stock Raising Homestead Act of 1916**

The original Ballard Patent, issued pursuant to the Stock Raising Homestead Act of 1916

(the "SRHA"), created the split estate at issue here.  The SRHA provides that the United States

must reserve all mineral rights to property otherwise conveyed under the Act.  *See* 43 U.S.C.

§ 299(a), *repealed by* the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701-

1782 (except with regard to reservations of coal and mineral rights and authorization of the

Department of Interior to promulgate regulations under the Act).[1]

Further, the SRHA clearly states that "[a]ll entries made and patents issued under the

provisions of this subchapter shall be subject to and contain a reservation to the United States of

all the coal and other minerals in the lands so entered and patented, together with the right to

---

[2] While the SHRA has been repealed as a homesteading law, the statute remains effective with
regard to the administration of the mineral right reserved by the United States.  *See Watt v.
Western Nuclear, Inc.*, 462 U.S. 36, 38, n. 1 (1983).

**REPORT AND RECOMMENDATION - 5**

prospect for, mine, and remove the same." *Id.* Consistent with this statutory mandate, the

Ballard Patent contains an express reservation of mineral rights for the United States. *Verified*

*Complaint to Quiet Title*, Ex. 2 (Docket No. 1-3).

The SRHA also directs that the United States, acting through the Secretary of Interior,

dispose of these mineral rights in accordance with the SRHA and the general mining laws. *See*

43 U.S.C. § 299. "The coal and other mineral deposits in such lands shall be subject to disposal

by the United States in accordance with the provisions of the coal and mineral land laws in force

at the time of the disposal." 43 U.S.C. § 299(a). The Department of Interior manages these

mineral rights through the BLM. *See* 43 U.S.C. § 1731.

The legacy of the SHRA includes a large number of split estates, such as the one at issue

here. *See, e.g.,* David L. Hughes, "Administrative Practice and Procedure before the IBLA-

Cases and Recent Developments," Rocky Mt. Min. L. Fdn. Paper No. 3 (2004); J. Benjamin

Winburn, Comment, *The Coalbed Methane Boom: The Push for Energy Independence Raises*

*Questions about Water and the Rights of America's Homesteaders*, 19 Tul. Envtl. L.J. 359

(Summer 2006). While the surface rights are in private ownership, the mineral rights remain in

the public domain subject to the SRHA and general mining laws.[2]

This legacy reflects the policy behind the SRHA, which was to develop the surface and

subsurface estates concurrently. *See Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 50 (1983). As

the United States Supreme Court has described, "The Act was designed to supply 'a method for

---

[3]  Because these mineral rights are in the public domain, any person qualified to locate and enter
the mineral deposits on these private lands has the right to enter upon the surface estate for the
purpose of prospecting thereon provided that the applicable notice and other requirements are
met. *See* 43 U.S.C. § 299(b).

**REPORT AND RECOMMENDATION - 6**

the joint use of the land by the entryman of the surface thereof and the person who shall acquire

from the United States the right to prospect, enter, extract and remove all minerals that may

underlie such lands.'" *Id.* (citing H.R.Rep. No. 35, 64th Cong., 1st Sess. 4, 18 (1916)).  While

the SRHA contains some protections for the surface landowner,[3] there remains a risk that mining

exploration could occur on the property without the surface landowner's consent.  *See* 43 U.S.C.

§ 299(d).

**C.     The Exchanges of the Ballard Property between the Freis and the FmHA**

On February 14, 1985, the Freis conveyed the Ballard Property to the FmHA by way of a

Deed in Satisfaction of Mortgage Indebtedness.  *Verified Complaint to Quiet Title*, Ex. 3 (Docket

No. 1-4).  It is undisputed that this deed included only the rights to the surface estate.

The FmHA, a predecessor to the Farm Services Agency, was an agency of the Department of

Agriculture that, among other things, supplied loans, including residential mortgages, to farmers

in rural areas.  *See* 7 U.S.C. §§ 1921, *et seq.*  *See also Love v. U.S.*, 844 F.Supp. 616, 618-19 (D.

Mont. 1994); *Baker v. U.S.*, 50 Fed. Cl. 483, 485, n. 1 (2001).  The Deed in Satisfaction of

Mortgage Indebtedness indicates that the Freis, at that time, had a mortgage in favor of the

FmHA and the mortgage was "in default and subject to foreclosure."  *Verified Complaint to*

*Quiet Title*, Ex. 3 (Docket No. 1-4).  Thus, the FmHA obtained title to the surface rights of the

Ballard Property as a result of the Freis' mortgage default.

------

[4] These protections include the written notice of an intent to file a mining claim, 43 U.S.C. § 299
(b), and compensation for damages to the "crops or other improvements" on the land, 43 U.S.C.
§ 299 (k).

**REPORT AND RECOMMENDATION - 7**

The FmHA treats property acquired due to mortgage default as "inventoried property." *See, e.g., National Wildlife Foundation v. Espy*, 45 F.3d 1337, 1341, n. 3 (9th Cir. 1995); 7 U.S.C. § 1985(g).  As mandated by statute, whenever such inventoried property is later sold, the FmHA must convey all mineral rights with the surface estate.  *See* 7 U.S.C.A. § 1985 (c)(3)(A) ("[A]ny conveyance of real property under this subsection shall include all of the interest of the United States in the property, including mineral rights.")

Consistent with this statutory mandate, the "Standard Sales Contract" used in the 1992 transaction between the FmHA and the Freis includes a promise from the "Government" to convey all mineral rights to which it has title.  *Verified Complaint*, Ex. 4 (Docket No. 1-5).  The seller identified in the contract is the United States of America, acting through the FmHA.  *Id.* In addition, the related quitclaim deed states that "The UNITED STATES OF AMERICA, acting through the Administrator of the Farmers Home Administration, United States Department of agriculture, CONVEYS and QUITCLAIMS to David V. Frei and Annabel M. Frei . . . all interest in the [Ballard Property]."  *Id.* at Ex. 5 (Docket No. 1-6).

Plaintiffs argue that the language in the contract and quitclaim deed means that the FmHA conveyed all property owned by any agency within the United States government, including the mineral rights to the Ballard Property.  According to Plaintiffs, once the FmHA obtained the surface rights to the Ballard Property, the United States, as a single entity, owned both the surface and subsurface rights to the Ballard Property.  Therefore, according to Plaintiffs, when the FMHA, acting on behalf of the United States, conveyed all its interest in the Ballard Property back to the Freis, the second transaction included both the surface and subsurface rights.

**REPORT AND RECOMMENDATION - 8**

As explained more fully below, the undersigned does not agree, because the FmHA conveyed to the Freis only that to which it had title, i.e., the surface rights to the Ballard Property.

**D.      The Legal Effect of Conveyance from the FmHA to the Freis**

The legal standards guiding the Court's interpretation of the conveyance include consideration and analysis of the merger doctrine and general rules of contract construction.

**1.      The Merger Doctrine**

Under Idaho law and the doctrine of "merger," the contract merged into the deed when the deed was "delivered and accepted as performance of the contract to convey." *Jolley v. Idaho Securities, Inc.*, 90 Idaho 373, 382, 414 P.2d 879, 388 (1966).  Therefore, "the deed alone must be looked to to determine the rights of the parties." *Id*.  Accordingly, the Court does not interpret the contract of sale, but construes the deed to determine what has been conveyed.

The "merger doctrine" has little practical effect here because the applicable deed is a quitclaim deed, and "[a] quitclaim deed conveys whatever interest the grantor possesses at the time of the conveyance." *Luce v. Marble*, 142 Idaho 264, 270, 127 P.3d 167, 173 (2005). Therefore, to determine what interest or property right was conveyed to the Freis, it is necessary to first determine who the grantor is and what the grantor possessed at the time of the conveyance.

**2.      Interpreting the Deed**

Interpreting a deed follows the same rules of construction applicable to all written instruments or contracts.  *See Union Pacific R. Co. v. Ethington Family Trust,* 137 Idaho 435, 438, 50 P.3d 450, 453 (2002).  "The purpose of interpreting a [written instrument] is to

**REPORT AND RECOMMENDATION - 9**

determine the intent of the contracting parties at the time the contract was entered." *Bakker v. Thunder Spring-Wareham, LLC*, 141 Idaho 185, 190, 108 P.3d 332, 337 (2005). In determining the intent of the parties, the instrument must be viewed as a whole. *Id.*

If the instrument is unambiguous, it will be given its plain meaning and its interpretation is an issue of law. *Id.* If the instrument is ambiguous, then its interpretation is a question of fact. *Cannon v. Perry*, 144 Idaho 728, 730-31, 170 P.3d 393, 395-96 (2007). When interpreting an ambiguous instrument, extrinsic evidence may be considered in order to determine the parties' intent at the time the instrument was drafted. *Id.*

Whether an instrument is ambiguous is a question of law. *See Dr. James Cool, D.D.S. v. Mountainview Landowners Co-op. Ass'n, Inc.*, 139 Idaho 770, 772, 86 P.3d 484, 486 (2004). A contract is ambiguous if it is reasonably subject to conflicting interpretations. *Id.*

In the instant case, the Quitclaim Deed from the FmHA to the Freis is ambiguous to the extent it is not clear whether it included all mineral rights held by the United States, including those managed by the Department of the Interior. However, this apparent ambiguity is resolved by reference to FmHA's legal authority to convey the mineral rights owned by the Department of Interior and managed by the BLM. A close examination of this authority demonstrates that the FmHA did not have authority over these mineral rights and, therefore, could not bind the Department of Interior to the exchange. Thus, the ambiguity can be resolved as a matter of law.

**E.      The FmHA Did Not Have the Authority to Convey the Mineral Rights at Issue.**

The FmHA, acting on behalf of the United States, could convey only that which it possessed, and that did not include the mineral rights reserved by the United States in the Ballard Patent. Moreover, while the BLM has such authority, there is no indication that the prescribed process

**REPORT AND RECOMMENDATION - 10**

for conveying mineral rights was followed.  Therefore, title to the mineral rights attached to the Ballard Property remains in the public domain and under BLM administration.

> **1.     The FmHA Did Not Have Authority to Convey Mineral Rights in the Public Domain.**

In 1992, when the FmHA conveyed the Ballard Property to the Freis, as today, whenever inventoried property is sold, the Secretary of Agriculture must convey all mineral rights with the surface estate.  *See* 7 U.S.C. § 1985(c)(3)(A).  "[A]ny conveyance of real property under this subsection shall include all of the interest of the United States in the property, including mineral rights."  *Id.*  The issue presented here is whether this statute extends to mineral rights originally reserved by the Department of Interior.  As explained more fully below, the legislative history indicates that the Secretary of Agriculture does not have authority to convey mineral rights originally reserved by the Department of Interior.  Such rights are in the "public domain," and subject to the exclusive province of the BLM.

"When confronted with a statute which is plain and unambiguous on its face, we ordinarily do not look to legislative history as a guide to its meaning."  *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184, n. 29 (1978).  However, legislative history may be consulted if applying the statute's plain meaning would result in an absurd result or is not in accord with legislative intent. *Id.*  Here, legislative history must be consulted, in order to avoid a result contrary to legislative intent.

**REPORT AND RECOMMENDATION - 11**

The statutory authority of the Secretary of Agriculture to transfer mineral rights is best understood in historical context.[4]  Under the Bankhead-Jones Farm Tenant Act of 1937, the Secretary of Agriculture was required to reserve, on behalf of the United States, not less than an undivided three-fourths interest in all coal, oil, gas and other minerals in or under all inventoried property.  Bankhead-Jones Farm Tenant Act, § 44, 50 Stat. 522, 530 (1937), *repealed by* the Farmers Home Administration Act, June 30, 1947, 60 Stat 1062.  However, after 1946, the Secretary of Agriculture was directed to include all mineral interests in any conveyance of real property.  *See* Farmers Home Administration Act, § 9, 7 U.S.C. § 1031.

Nonetheless, as a consequence of the prior legislation, the Secretary of Agriculture had reserved an interest in at least some portion of the mineral rights to farms otherwise conveyed under the Bankhead-Jones Farm Tenant Act between 1937 and 1946.  After 1947, the Department of Interior was authorized to administer mineral leases on such lands.  *See* Mineral Leasing Act of 1920, *as amended* by Act of August 7, 1947, the "Mineral Leasing Act for Acquired Lands."  Consequently, the Department of Interior administered the mineral rights otherwise reserved by the Secretary of Agriculture.

The resulting split in title and authority led to the enactment of new legislation in 1950 that provided the Secretary of Agriculture with clear guidance for disposing of the mineral interests it previously reserved.  *See* 7 U.S.C.A. §§ 1033-1035.  The House Committee on Agriculture Report accompanying this legislation described the situation as follows:

---

[4]  The historical context conveyed herein is adapted, in large part, from a letter to the Senate Committee on Agriculture and Forestry from the United States Department of Agriculture dated October 14, 1949.  *See* S. Rep. No. 81-1327 (1949), *as reprinted in* 1950 U.S.C.C.A.N. 3580, 3582.

**REPORT AND RECOMMENDATION - 12**

> Title to these mineral rights is in the Secretary of Agriculture as is
> the administration of the loan programs under which the rights
> were acquired, and the administration of all matters relating to the
> surface title.  The responsibility for administering the mineral
> rights and the handling of mineral loans and royalties is, however,
> in the Department of Interior.  This means that the individual
> landowner, or a prospective lessee of the mineral interests, must
> deal with two Government agencies regarding the same tract of
> land, and that the Farmers Home Administration of the Department
> of Agriculture and the Bureau of Land Management of the
> Department of the  Interior must keep duplicate and virtually
> identical books on the same lands.

H. Rept. No. 81-803 (1949), *as reprinted in* 1950 U.S.C.C.A.N. 3580, 3587-88.

    The legislation designed to address this problem, 7 U.S.C. §§ 1033-1035, directs the

Secretary of Agriculture to convey the reserved mineral interests to the surface owners for either

$1, if there is no active mineral development or leasing in the area, or for the fair market value.

*See* 7 U.S.C.A. §§  1034-1035.  If no sale occurs within seven years, the legislation requires the

Secretary of Agriculture to transfer title to the mineral rights to the Secretary of Interior "to be

administered under the mineral laws of the United States." 7 U.S.C. § 1035.

    While the statute is not directly applicable here, its text strongly suggests that the

Department of Agriculture and Department of Interior hold title to property separately from one

another.  Further, its legislative history underscores the difference between property acquired by

the FmHA and property managed by the BLM as part of the public domain.  For example, the

House Committee on Agriculture also reported as follows:

> The committee is in complete agreement with the general policy of
> the Federal Government that mineral rights in the public domain
> and those which have been acquired primarily for the conservation
> of mineral resources should be retained perpetually in the Federal
> Government. It finds a clear distinction, however, between such

**REPORT AND RECOMMENDATION - 13**

mineral rights and those which are involved in the agricultural
lands dealt with in this bill.

The lands involved here are all farms. They were acquired by the
Secretary of Agriculture either pursuant to an agriculture
improvement program, pursuant to the operation of one of the
agricultural credit programs, or in the process of returning to
agricultural use lands taken for war purposes. In each case, title
was acquired by the Department of Agriculture for the purpose of
resale to farmers for agricultural purposes. . . .  It seems to the
committee that the policy involved in these lands should be one
entirely different from that where the basic purpose has been to
acquire and hold in perpetuity large blocks of land in which the
public interest is determined to be paramount to individual
ownership.

H. Rept. No. 81-803 (1949), *as reprinted in* 1950 U.S.C.C.A.N. 3580, 3586.

This legislative history supports the conclusion that the FmHA did not have title to, nor

authority over, the mineral rights attached to the Ballard Property.  The mineral rights to the

Ballard Proeprty have been in the public domain, owned by the Department of Interior and

managed by the BLM.  Because there is no evidence in the record suggesting that these mineral

rights were ever transferred to, or otherwise acquired by, the FmHA, and there is no express

authority for the FmHA to convey mineral rights held by the Department of Interior, the FmHA

could not convey them to the Fries along with the surface rights to the Ballard Property.

**2.      The BLM Did Not Convey the Mineral Rights to the Ballard Property.**

In 1992, as now, the Department of Interior may convey the mineral rights together with

surface rights to a particular piece of property but only if the Secretary of Interior follows a

prescribed process.  *See* 43 U.S.C. § 1719.  The process prescribed by statute is as follows:

(1) The Secretary, after consultation with the appropriate
department or agency head, may convey mineral interests owned
by the United States where the surface is or will be in non-Federal

**REPORT AND RECOMMENDATION - 14**

ownership, regardless of which Federal entity may have
administered the surface, if he finds (1) that there are no known
mineral values in the land, or (2) that the reservation of the mineral
rights in the United States is interfering with or precluding
appropriate nonmineral development of the land and that such
development is a more beneficial use of the land than mineral
development.

(2) Conveyance of mineral interests pursuant to this section shall
be made only to the existing or proposed record owner of the
surface, upon payment of administrative costs and the fair market
value of the interests being conveyed.

(3) Before considering an application for conveyance of mineral
interests pursuant to this section--

> (i) the Secretary shall require the deposit by the
> applicant of a sum of money which he deems sufficient
> to cover administrative costs including, but not limited
> to, costs of conducting an exploratory program to
> determine the character of the mineral deposits in the
> land, evaluating the data obtained under the exploratory
> program to determine the fair market value of the
> mineral interests to be conveyed, and preparing and
> issuing the documents of conveyance: Provided, that, if
> the administrative costs exceed the deposit, the
> applicant shall pay the outstanding amount; and, if the
> deposit exceeds the administrative costs, the applicant
> shall be given a credit for or refund of the excess; or
>
> (ii) the applicant, with the consent of the Secretary,
> shall have conducted, and submitted to the Secretary
> the results of, such an exploratory program, in
> accordance with standards promulgated by the
> Secretary.

(4) Moneys paid to the Secretary for administrative costs pursuant
to this subsection shall be paid to the agency which rendered the
service and deposited to the appropriation then current.

43 U.S.C. § 1719 (b).

**REPORT AND RECOMMENDATION - 15**

Thus, the Secretary of the Interior may convey the mineral rights associated with property owned by the FmHA, but only upon certain findings and a payment of fair market value. Neither the record, nor the parties, suggest that such a process was followed. Therefore, the mineral rights remain in the public domain.

### 3.    The Distinction Between Public and Acquired Land

This decision, in large part, reflects the distinction between property in the public domain and property acquired later. "Acquired land is Government owned land acquired from private ownership. Public land is Government owned land which was part of the original public domain." *Thompson v. U.S.*, 308 F.2d 628, 631 (9th Cir. 1962) (quoting *Barash v. Seaton*, 256 F.2d 714, 715 (C.A.D.C. 1958)). The distinction was determinative in *Thompson*, a case in which the Ninth Circuit held certain timber lands acquired by the United States Forest Service via a donation did not become "public lands" subject to mineral entry under the National Forest Act of March 3, 1891. *Thompson v. U.S.*, 308 F.2d at 631. Similarly, in an earlier case, *Rawson v. United States*, 225 F.2d 855 (9th Cir. 1955), the Ninth Circuit determined that farms purchased by the United States for the purposes of "retiring submarginal lands from agricultural use, to prevent soil erosion, to protect watersheds, to conserve wildlife and other allied purposes" and managed by the Department of Agriculture did not become "public lands" open to location under the general mining laws. *Id.* at 856.

Both cases found the purpose of the acquisition controlling and rely upon the precedent set forth in *Oklahoma v. Texas*, 258 U.S. 574 (1922). In *Oklahoma v. Texas*, the United States Supreme Court determined that the General Mining Act of 1872 applied only to the public lands and "[o]nly where the United states has indicated that the lands are held for disposal under the

**REPORT AND RECOMMENDATION - 16**

land laws does the section apply; and it never applies where the United States directs that the disposal be under other laws." *Id.* at 599-600.

These cases are not directly on point.  However, they do draw a distinction between property in the public domain and property acquired later, and demonstrate how the purpose of the acquisition helps determine how the property will be managed.  In the instant case, the distinction is reflected in the split estate with mineral rights, held by the BLM as part of the public domain and the surface estate, held by the FmHA acquired due to foreclosure.

The BLM and FmHA administer property for very different purposes and, therefore, are subject to different statutory and regulatory authority.  Without express authority to do so, the FmHA cannot override or fail to comply with BLM procedures and convey mineral rights while in the public domain in the process of disposing inventory property.

**F.**      **Other Alleged Defects in the Chain of Title**

Because the Freis did not obtain the mineral rights at issue here, it is not necessary to discuss the other alleged defects in the chain of title.  Nonetheless, because this decision is submitted as a Report and Recommendation, if the district judge addresses this particular issue, it is recommended that the defects alleged by the United States have been resolved by Plaintiffs' subsequent submissions supplementing the record.

The United States argues that the chain of title from the Freis to the Holmes has two gaps. The United States notes that the Idaho Secretary of State has no record of either Rocky Mountain Sports & Gaming LLC or Rocky MT. Land LLC, two of the LLC's in Plaintiffs' chain of title. *See United States Memorandum Supporting Motion for Summary Judgment*, p. 2 (Docket No.

**REPORT AND RECOMMENDATION - 17**

14-2).  The United States argues, therefore, that these LLC's did not have authority to convey the Ballard Property.

The Idaho Secretary of State does not have records for Rocky Mountain Sports & Gaming, LLC or Rocky MT Land LLC, because they are foreign corporations.  According to the record, Rocky Mountain Sports & Gaming, LLC is a Colorado limited liability company and Rocky MT. Land LLC is a Nevada limited liability company. *Supplemental Affidavit of Christ T. Troupis*, Exs. A, B (Docket No. 19-2).  Their failure to register to do business in the State of Idaho does not affect the subsequent chain of title.  It is clear that "[t]he failure of a foreign limited liability company to register in [Idaho] does not impair the validity of any contract or act of the foreign limited liability company."  I.C. § 53-656.  Moreover, neither owning real property, nor selling it in an isolated transaction completed within 30 days, constitutes transacting business within the meaning of the Idaho Limited Liability Company Act.  I.C. § 53-657; *see also Capstar Radio Operating Co v. Lawrence*, 143 Idaho at 707, 152 P.2d at 579 (2007).[5]

In light of the above, the Court concludes that the chain of title is not defective on the basis that two of the entities in the chain were foreign LLC's that had not registered to conduct business in the State of Idaho.

---

[6] In addition to these statutory provisions, Idaho case law predating the passage of the Idaho Limited Liability Company Act, sets out the same controlling principles of law subsequently incorporated into the statute.  *See Perry v. Reynolds*, 63 Idaho 457, 462, 122 P.2d 508, 513 (1942) (holding single, isolated transaction does not constitute doing business); *Burley Newspapers v. Mist Publishing Co.*, 90 Idaho 515, 521-22, 414 P.2d 460, 466-67 (1966) (holding contracts made by non-complying corporation not void or voidable).

**REPORT AND RECOMMENDATION - 18**

# VI.

## REPORT AND RECOMMENDATION

There is no apparent defect in the chain of title applicable to Plaintiffs' surface right to the Ballard Property.  However, Plaintiffs have not demonstrated ownership rights to the mineral interests attached to this Property.  These mineral rights are, and always have been, in the public domain.  Even if the FmHA had intended to convey such rights to the Fries, the FmHA lacked authority to do so.  Therefore, for the reasons stated herein, it is recommended that the district court deny Plaintiffs' Motion for Summary Judgment (Docket No. 11) and grant Defendant's Cross-Motion for Summary Judgment (Docket No. 14).



DATED:  **November 4, 2008**.

Honorable Larry M. Boyle
U. S. Magistrate Judge